Lance **CURLEY, et al., Plaintiffs,**

v.

**CUMBERLAND FARMS DAIRY, INC., et al., Defendants.**

**Civ. A. No. 86–5057(SSB).**

United States District Court, D. New Jersey.

Dec. 29, 1989.

As Amended Feb. 2, 1990.

---

Fredric J. Gross, Fredric J. Gross Law Firm, Mount Ephraim, N.J., Philip Stephen Fuoco, Office of Philip Stephen Fuoco, Haddonfield, N.J., and Michael R. Needle, Needle & Feldman, Philadelphia, Pa., for plaintiffs.

Nicholas W. McClear and Kathleen Cavanaugh, Wilenz, Goldman & Spitzer, Woodbridge, N.J., for defendants.

BROTMAN, District Judge.

Presently before the court are several motions. First, plaintiffs move for class certification pursuant to Fed.R.Civ.P. 23(b)(3). In response, defendants have filed a cross-motion to compel discovery on the class certification issue. Second, plaintiffs move to reinstate two types of claims: the claims of specific plaintiffs dismissed as untimely under the applicable statute of limitations, and the claims of all plaintiffs under § 1962(c) and § 1962(d) against the corporate defendants. Third, defendants move to dismiss portions of plaintiffs' complaint. In response, plaintiffs have filed a cross-motion to strike defendants' motion to dismiss. The fourth motion presently pending before the court is plaintiffs' appeal of the magistrate's protective order.

## I. FACTS AND PROCEDURE

On December 24, 1986, plaintiffs filed a class action suit asserting claims under federal and state anti-racketeering laws, 18 U.S.C. § 1962 and N.J.Stat.Ann. § 2C:41–2 (West 1982), along with a host of common law tort claims. Plaintiffs are all former employees of Cumberland Farms, Inc., a closely held Delaware corporation, which, through its subsidiaries, operates 1300 retail convenience stores throughout the Northeast and Florida. The crux of plaintiffs' claim is that defendant Cumberland Farms and the individually named defendants, who are present and former officers and employees of Cumberland Farms, carried out a scheme by which low-level employees were wrongfully charged with stealing money and merchandise from the stores. These employees were then allegedly coerced into signing confessions through threats of immediate arrest, notification of family members, other employers, or the media. Plaintiffs allege this activity has gone on for more than twelve years. Second Amended Complaint ¶ 54.

On April 15, 1987, before defendants had filed an answer, plaintiffs amended their complaint and added new parties both as plaintiffs and defendants. A scheduling conference was held before United States Magistrate Jerome Simandle on June 16,

1987, and a scheduling order was issued. That order directed that the class certification issue should await resolution of the defendants' dispositive motions. On July, 30, 1987, all defendants except Colleen Walsh moved to dismiss the amended complaint for failure to state a claim upon which relief could be granted.

In an opinion filed November 17, 1987, this court granted in part and denied in part defendants' motion to dismiss. Specifically, the court found that plaintiffs had failed to allege an "enterprise" distinct from defendant Cumberland Farms under the § 1962(c) claim. *Curley v. Cumberland Farms*, No. 86–5057(SSB) slip op. at 6–8 (citing, *inter alia*, *B.F. Hirsch v. Enright Manufacturing Co.*, 751 F.2d 628 (3d Cir.1984)). The court also dismissed the conspiracy claim under § 1962(d) because the court found that a corporation was incapable of conspiring with its own officers or employees. *Id.* at 18 (citing, *inter alia*, *McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492, 1510, 1512 (D.V.I. 1987); *Yancoski v. E.F. Hutton & Co., Inc.*, 581 F.Supp. 88, 97 (E.D.Pa.1983)). The court likewise dismissed plaintiffs' claims against Cumberland Farms under the analogous provisions of the New Jersey RICO statute. *Id.* at 21–22.

Also before the court in November, 1987 were the motions of all defendants to dismiss the RICO claims of plaintiffs Bayer, Cox, Friedman, Gruner, Capner, and Boguslav. The court found that the four year statute of limitations barred these claims because they had occurred more than four years before the filing of the complaint and there had been no fraudulent concealment by defendants.

Finally, also before the court were other motions to dismiss various other claims asserted by plaintiffs. These were all denied, except in that plaintiffs were given thirty days in which to amend the complaint so as to comply with the loose notice-pleading requirement of Fed.R.Civ.P. 8(a). Plaintiffs filed a second amended complaint on December 14, 1987.

The Second Amended Complaint contains the following counts: first, claims under

§ 1962(c) and § 1962(d) (¶ 386); second, claims under N.J.Stat.Ann. § 2C:41–2(c) and 2C:41–2(d) (¶ 411); third, claims for injunctive and equitable relief under § 1964(a) and § 1964(c) (¶ 414); fourth, claims for injunctive and equitable relief under N.J.Stat.Ann. § 2C:41–4(a), and § 2C:41–4(c) (¶ 416); fifth, a claim for intentional harm based on the Restatement of Torts § 870 (¶ 418); sixth, a claim for extortion (¶ 423); and seventh, a claim for malicious abuse of process (¶ 427). The Second Amended Complaint also contains a "reservation of rights" (¶ 431). Since the filing of the second amended complaint, the parties have proceeded with discovery limited to the class certification issue.

This litigation focuses on the legitimacy and legality of Cumberland's loss-prevention techniques. Cumberland employs approximately 12,000 people at any given time; during the course of a year, the work force turns over three times. Transcript of *Commonwealth of Pennsylvania v. Alan Hass*, (Feb. 3, 1987) M.C. No. 86–03–3050 (testimony of Arthur Gordon) at 23. The increasingly competitive nature of the industry, due to the influx of stores owned by oil companies, is widely known, *see* "Rethinking the Convenience Store," (C. Deutsch) N.Y. Times Section 3 p. 1 (Sunday, October 8, 1989), and the profitability of any given store depends in part on the inventory shrinkage that the store experiences. Cumberland loss prevention specialists considered any store experiencing inventory loss that exceeded one percent to be a problem store. *See* Deposition of Gordon at 18. A loss as high as two percent was considered to be a high loss. *Id.* at 29.

Inventory loss could be for any of several reasons. Accounting problems, including the misdelivery of goods meant for one store to another, could explain discrepancies between the inventory on paper and the actual inventory in the store. *Id.* at 22, 24. Included in accounting problems was vendor dishonesty, which occurs when, for example, a soft drink seller bills a store for thirty cases of soda when only twenty-five

were delivered. *Id.* at 24. Shoplifting was not a common source of inventory discrepancies. *Id.* at 25. Loss prevention specialists were able to resolve as many as fifty percent of the inventory problems through auditing the paperwork. When the problem could not be attributed to accounting problems, suspicion turned to individual employees.

Loss prevention specialists had three basic methods for investigating employees in problem stores. First, loss prevention specialists could send in hired shoppers to make prearranged purchases. At the end of the day, the purchases made would be compared to the purchases recorded, to see if the employee was simply pocketing some of the sales. The second method was physical surveillance from outside the store. A loss prevention specialist would station himself[1] outside the store and watch through high powered binoculars the employee under investigation. *Id.* at 47–48. The third method of investigation was internal surveillance from a hidden observation space with which most stores were equipped.

If an investigation produced evidence of dishonesty, the loss prevention specialist would confront the employee. The other bases for an interview with an employee were failing to observe company policy with respect to filling out drop sheets, keeping too much cash in the drawer, failing to inventory cigarettes on a daily basis, and bank deposit irregularities. *Id.* at 81–93. Interviews typically were conducted in a back room with no one present except the employee and the loss prevention specialist, although on occasion a loss prevention specialist in training would listen from outside the door.

## II. DISCUSSION

█ As a threshold matter, the court must discuss the order in which it will address the motions. Defendants have correctly indicated to the court that the issue

---

1. For no apparent reason, *all* the loss prevention specialists were men. Deposition of James

Mumma at 33.

of the class certification depends in large part on the status of the complaint. The court cannot determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," Fed.R. Civ.P. 23(b)(3), until the court has first determined what law, as alleged in the complaint, shall govern the class certification inquiry.

By letter dated September 28, 1989, the court directed the parties to address the certification issue with respect to the complaint as it then stood. The court also informed the parties that it would explain in a more formal manner the reasons for its selection of such a schedule for briefing. Those reasons are as follows.

Fed.R.Civ.P. 23(c)(1) provides:

As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

Rule 23(c) is mandatory. It directs the district court to determine as soon as practicable whether to certify a class. It is now past the third anniversary of the filing of the original complaint. Discovery limited solely to class certification has proceeded since June 18, 1987, when Judge Simandle entered an order limiting discovery to class certification. As is clear from Judge Simandle's letter opinion, dated March 29, 1989, this litigation has been characterized by delay. To further delay the class certification determination would only serve to postpone indefinitely the resolution of this dispute.

There would be no end to the delay where, as here, the purported basis for postponing the certification determination is that the law has changed. Plaintiffs have moved to reinstate claims in the complaint and defendants have moved to dismiss certain counts in the complaint. Both motions are based on changes in the law. Defendants claim that they cannot properly address the class certification issues unless they know what allegations contained in the complaint will control the class certification inquiry. The court must at this time reject these arguments.

The law is always changing, and to recognize this to be a basis for postponing class certification would be never to decide whether to certify a class. Parties who wish to drag out litigation would always be able to unearth some recent case that sheds some ray of new light on aspects of the case that the court has already addressed. In the instant case, plaintiffs filed the Second Amended Complaint on December 14, 1987. Defendants cannot seriously contend that this is the first opportunity that they have had to move to dismiss new counts in the second amended complaint.

## A. Class Certification

■ As this court has noted on at least one prior occasion, "[c]lass actions may not be approved lightly. The Supreme Court has recently emphasized that a class action 'may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Seiler v. E.F. Hutton*, 102 F.R.D. 880, 887 (D.N.J.1984) (citing *General Telephone Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982)). Before turning to the requirements of Rule 23, the court notes that the burden of proof rests with the proponent of the class action. *Zlotnick v. Tie Communications, Inc.*, 123 F.R.D. 189, 190 (E.D.Pa.1988); *Gavron v. Blinder Robinson & Co.*, 115 F.R.D. 318, 321 (E.D.Pa.1987); *Seiler*, 102 F.R.D. at 887 (citing 3B Moore's Federal Practice § 23.02–2 at 23–96 n. 35 (2d ed. 1984)).

■ Although the court may not look to the merits when determining whether to certify a class, *Seiler*, 102 F.R.D. at 889 n. 4 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974)), the court must look beyond the bald allegations in the complaint to determine whether plaintiff has satisfied the requirements of Rule 23. *Glictronix Corp. v. American Telephone & Telegraph, Co.*, 603 F.Supp. 552, 584

(D.N.J.1984) (citation omitted). Out of fairness to potential members of the class who may have their claims extinguished if the court certifies a class as to all claims in the second amended complaint only then to dismiss some of those claims,[2] it is appropriate for the court to look at the allegations of the complaint only enough to determine whether the cause of action may survive a motion to dismiss. *In re Orfa Securities Litigation*, 654 F.Supp. 1449, 1459 (D.N.J. 1987). Thus, the court will consider the defendants' motion to dismiss simultaneously with the class certification motion.

Plaintiffs propose the following class definition:

> All persons at any convenience store or gasoline station owned or operated by a subsidiary of Cumberland Farms, Inc. or Cumberland Farms Dairy, Inc., who were at any time from October 15, 1970 through the present, the subject of questioning or attempted questioning by field agents of the corporate defendant's Loss Prevention Department (formerly known as the Security Department) and who suffered injury to their business or property as a result.

Plaintiffs' Motion for Class Certification at 1.[3]

Fed.R.Civ.P. 23(a) sets forth the following prerequisites to maintaining a class action:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

The court will address these requirements *seriatim.*

### 1. Numerosity

Plaintiffs claim that the proposed class contains approximately 14,000 members in the Northeast part of the country and Florida. Plaintiffs Memorandum In Support of Class Certification at 9. Defendants do not contest this figure. Other courts which have discussed the numerosity requirement for class certification have considered certification appropriate where the members of the proposed class were far less numerous. *E.g., Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.) (declining to decide to certify class on other grounds, but noting that "allegation of more than 90 geographically dispersed defendants met the numerosity requirement"), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *In re Orfa Securities Litigation*, 654 F.Supp. 1449, 1464 (D.N.J. 1987) (joinder of 1,593 potential class members impracticable). Thus, the court concludes that plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

### 2. Common Questions of Law or Fact

The Second Amended Complaint alleges that defendants' "pattern of racketeering activity involves systematic and repeated acts of extortion in violation of state laws, extortionate collection of credit in violation of 18 U.S.C. § 894, mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343." Second Amended Complaint ¶ 387. The de-

---

**2.** Although class certification is sought pursuant to Rule 23(b)(3), which requires that potential members of the class be provided with the opportunity to opt out of the class, Fed.R.Civ.P. 23(c)(2), the court recognizes that there exists some possibility for confusion. *See, e.g.,* A. Miller, *Problems Of Giving Notice In Class Actions*, 58 F.R.D. 313, 321–22 (1972) (discussing confused responses of class members after receiving notices).

**3.** The court asked plaintiff's counsel at oral argument whether persons criminally convicted

of theft were included in the proposed class, and if so, whether such persons' claims would be precluded by the full faith and credit statute. 28 U.S.C. § 1738. *See Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 83–83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984); *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). In light of this court's determination not to certify a class action at this time, it is unnecessary to address this issue, which was prompted by the twin concerns of comity and federalism.

terminative issue is whether plaintiffs have shown that there are legal or factual issues common to the class concerning the alleged predicate acts.

There are some aspects of the practices of the loss prevention department's operations that are clearly common to the class. Each year the department conducts approximately 2,000 interviews. Deposition of James Mumma at 73. To give some idea of the magnitude of the claims and the proposed class, plaintiffs contend that in 1988, the last year for which there is complete information, there were 2,197 questionings which resulted in 1,163 confessions. *Cf.* Deposition of Arthur Gordon at 107 (statements obtained in two-thirds of all questionings). Those confessions were for a total amount of $916,000, of which $401,000 was received.[4]

The loss prevention department was a fairly loosely run organization. Meetings with all the field agents were rare; one occurred every two or three years. Mumma Deposition at 127. All field agents were trained on-the-job, and there were no manuals. Declaration of Eugene Epperson at 2. Most of the specialists were trained by either Arthur Gordon or Charles Brink. Deposition of James Mumma at 99. The method for obtaining confessions was part of that training. *Id.* at 99–100.

According to Eugene Epperson, formerly a loss prevention specialist, Cumberland Farms trained its employees to conduct the interview in a back room where the loss prevention specialist and the employee were alone. Deposition of Epperson at ¶ 11–13. Once there, the employee was to sit on a carton while the loss prevention specialist remained standing at the door; this was done to intimidate the employee. *Id.* On some occasions, an employee would be questioned only because the store in which that employee worked had a bad inventory report. *Id.* at ¶ 29. In one instance, Arthur Gordon testified that he had

witnessed and signed contemporaneously the confession of Alan Hass, *see Commonwealth v. Hass,* M.C. # 86–03–3050 (Feb. 3, 1987) transcript at 9, when it appears from Cumberland records that there was originally no witness' signature on the confession. *See* Exhibit G to Declaration of Fredric Gross (Memo from James Mumma to Arthur Gordon concerning the prosecution of Alan Hass) (criticizing Gordon for the lack of signature).

There were some policies concerning the content of the confessions, although these policies were not written. Loss prevention specialists were trained to have the employee acknowledge the *Miranda* rights, state the number of the store at which the theft occurred, state the highest amount stolen, the average per week, and the total amount stolen. Deposition Gordon at 122. Thus, from the testimony and the twenty-six confessions submitted, the standard confession, the form of which was in all likelihood dictated, was as follows:

I, (employee's name), born on _____, living at _____, have been advised of my legal rights (the basic *Miranda* warnings). I believe this statement to be true. From _____ to _____, while working at store # _____, I consumed while working or gave away merchandise not paid for. Typical items included (candy, cigarettes, etc.). The average amount per week or shift was $_____, with the highest amount in one week being $_____. The total value of things taken was $_____.

Again, I make this statement of my own free will having been warned of my rights.

(Signed and dated).

This evidence, although interesting, does not establish that class certification is appropriate. To satisfy the requirements of Rule 23(a), plaintiffs must show common issues of law or fact as those terms are

---

4. Plaintiffs allege that this information has been compiled from documents produced by Cumberland Farms. Declaration of Fredric Gross at ¶ 3. Plaintiffs have not supplied the court with the documents from which these figures are culled. Defendants object that plaintiffs' coun-

sel's assertions are conclusory and hearsay and therefore unreliable and should be stricken. Defendants Brief in Opposition to Class Certification at 13 n. 8. Defendants, however, do not contest the accuracy of these figures.

defined by the substantive claims made in the complaint.[5] Although the evidence does establish that some aspects of defendants' conduct towards plaintiffs was common to all plaintiffs, the conduct has not been shown to be common with respect to the alleged pattern of extortion.

Plaintiffs have stressed, both at oral argument and in their brief, that there is a "conspiracy" that makes class certification appropriate. In antitrust cases, the existence of a conspiracy is relevant to class certification because the existence of a conspiracy is an element of the substantive antitrust claim. 15 U.S.C. § 1.

In the instant case, the existence of a conspiracy is an element of only one cause of action raised in the complaint: the claim under § 1962(d). To show standing under § 1962(d) each potential member of the class must show an injury from an act in furtherance of the conspiracy. *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1169 (3d Cir.1989). Each individual's proof of standing under this provision would require more than merely showing that each plaintiff was interviewed, for an interview itself does not injure the interviewee. Instead, each member of the class would be required to prove that he or she suffered harm from an interview, and that the harm was inflicted in furtherance of the conspiracy; this proof would be virtually identical to the proof of the underlying predicate act of extortion or attempted extortion. Where the proof of claims involves individualized proof of the substantive elements of the claim, class certification is inappropriate. *Cf. Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977) (class certification appropriate where coercion in tying arrangement evident in standardized leases applicable to all members of class), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir.1976) (no commonality where each plaintiff would be required to prove coercion in relation to alleged tying arrange-

ment), *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

In the instant case, plaintiffs' claim is that defendants engaged in a pattern of racketeering activities directed toward the proposed class of plaintiffs. Under § 1962(c), proof of the predicate acts is coextensive with the proof of the pattern of racketeering activity. *Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1268 (3d Cir.1987).

In this case, the predicate acts alleged turn on individualized proof pertaining to each interview. Plaintiffs allege three predicate acts: extortionate collection of credit, mail fraud, and wire fraud. Proof of extortionate collection of credit encompasses a showing of some express or implicit threat. *See United States v. Levy*, 694 F.Supp. 1136, 1139 (D.N.J.1988). That showing necessarily depends on what transpired in the back rooms of each store. Likewise, whether the mails or interstate communications were used as part of a scheme to defraud, *see Schreiber Distributing v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir.1986) (mail fraud); *United States v. Pritchard*, 773 F.2d 873, 876 (7th Cir.1985) (wire fraud), *cert. denied*, 474 U.S. 1085, 106 S.Ct. 860, 88 L.Ed.2d 899 (1986), depends on whether each employee was the victim of extortion.

The evidence submitted reveals the problematic nature of class certification in this case. Plaintiffs have submitted copies of signed confessions, the statement of a former loss prevention specialist, and the testimony of two members of the loss prevention department. Plaintiffs have not provided the court with the letters which form the basis of the mail fraud predicate acts, nor have they presented evidence that shows a corporate policy applicable on a class-wide rather than individual basis. For example, plaintiffs have shown that in the case of any particular store, defendants obtained confessions from employees that exceeded the total shrinkage from that

---

5. The court proceeds with the class certification determination on the basis of the claims that

withstand the motion to dismiss. *See infra.*

store. Thus, the entire case hinges on what occurred with each employee.

The general rule is that "an action based substantially on oral communications is inappropriate for treatment as a class action." *Graham v. Security Savings and Loan*, 125 F.R.D. 687, 690–91 (N.D.Ind. 1989); *Glick v. E.F. Hutton*, 106 F.R.D. 446, 449 (W.D.Pa.1985) (quoting *Seiler*); *Seiler*, 102 F.R.D. at 888. The policy animating this rule is that oral communications tend, by their very nature, to be individualized, and thus class treatment is improper. The exception to the rule is in the case of oral presentations that are scripted, and therefore likely to be common rather than individual. *See Seiler*, 102 F.R.D. at 888.

The instant case presents the court with difficulty in applying these rules. On one hand, plaintiffs have produced allegations and evidence that does suggest some standardized oral presentation to each employee. On the other hand, this evidence does not relate to a pattern of extortion common to all employees.

The common aspects of defendants' conduct is most accurately characterized as legitimate. It cannot be the position of the plaintiffs that defendants may not question employees in order to prevent inventory loss. Nor can it be plaintiffs' position that it is illegal for defendants to seek to have an employee insert into a written confession certain facts that will allow the confession to withstand challenges should the employee be prosecuted when the employee has in fact stolen from the store.

The nature of the evidence in this case creates a danger that the court will improperly conclude that plaintiffs have shown the alleged illegal pattern of extortion to be common to the class on the basis of the legitimate conduct, the interviewing, that is unquestionably common to the class.

In many ways, this is similar to the issue confronted by the Supreme Court in *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). *Monsanto* involved an alleged conspiracy between a manufacturer and its distributors to terminate a low-price distributor who refused to follow illegal resale price maintenance levels. The Supreme Court fashioned an evidentiary standard for proof of an illegal conspiracy between a manufacturer and its distributors that took into account that a manufacturer, as a practical matter, needed to be able to communicate with its distributors and to impose certain legal restrictions on distributors. *Id.* at 763, 104 S.Ct. at 1470 (citing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). The Court went on to hold that "something more than evidence of complaints [from the distributors to the manufacturer] is needed. There must be evidence that tends to exclude the possibility that the manufacturer and non-terminated distributors were acting independently." *Id.* 465 U.S. at 764, 104 S.Ct. at 1471.

In the instant case, plaintiffs contend that there is a pattern of extortion. The evidence and the allegations submitted thus far do not establish a pattern of extortion that was a part of the standard corporate policy with respect to employees' confessions. The reasoning underlying the *Monsanto* analysis applies to the allegations of the instant case. Plaintiffs must show more than simply that defendants acted in a manner common to the class. Plaintiffs must present evidence that tends to demonstrate that defendants acted in a manner common to the class *in terms of extortion*. The court declines to find, on the basis of ambiguous evidence comprised almost exclusively of oral communications, that plaintiffs have carried their burden under Rule 23(a) of showing issues of fact or law common to the class concerning a plan to extort false confessions.

### 3. Typicality

The parties have not addressed the issue of typicality, and the court assumes that plaintiffs' claims are typical of the claims of the class in that the named plaintiffs' recoveries depend on legal claims typical to the class.

### 4. Adequacy of Representation

The parties do not seriously dispute the adequacy of the named class representatives or their counsel to represent the class.

Plaintiffs must further show that the requirements of Rule 23(b)(3) have been satisfied. Rule 23(b)(3) provides that a court may certify a class action if:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

### 5. Predominance of Common Questions

■ Plaintiffs have not shown that common issues predominate over individual issues. In this case, the importance of the details clearly outweighs the single determination that defendants alleged acts are actionable under RICO. Each potential member of the class will have to show that he or she was the victim of extortion; a showing that the loss prevention specialists committed a pattern of acts of extortion to certain plaintiffs does not demonstrate that any particular plaintiff who confessed necessarily did so because of an extortionate threat. The difficulties in terms of the proof of claims weigh heavily in consideration of the prerequisite of predominance. "Without the possibility of a *per se* rule on the issue of liability, there is no demonstrable purpose in seeking to resolve what would become an essentially irrelevant issue for the class as a whole." *Mertens v. Abbott Laboratories*, 99 F.R.D. 38, 41–41 (D.N.H.1983) (refusing to certify class of users of deithylstilbestrol (DES) because of difficulties in terms of proximate cause).

The court recognizes that the existence of a pattern is not irrelevant to each plain-tiff's claim; to the contrary, it is an element of each claim. The existence of such a pattern would become a non-issue in subsequent suits by operation of the doctrine of offensive non-mutual collateral estoppel if plaintiffs in this action succeed.

### 6. Superiority to Alternatives to a Class Action

■ There is in this case a reasonable alternative to class certification. Defendants will be collaterally estopped from relitigating issues that are common to the class. If plaintiffs establish the pattern of extortion, all that will be necessary for a remaining member of the class to prove is that he or she was a victim of extortion. Since each member of the class would be required to make such a showing at the proof of claim stage if the court were to certify a class, and in view of the court's concerns in terms of certifying a class on the basis of oral communications, the court finds that the most reasonable method of proceeding is on an individual, case-by-case method. *Cf.* Advisory Committee Note to 1966 Amendment to Rule 23 (citing Weinstein, *Revision of Procedure: Some Problems in Class Actions*, 9 Buffalo L.Rev. 433, 438–54 (1960) (test-case method).

Plaintiffs argue that the claims involved are too small to warrant individual suits. Each individual claim is for an amount in the area of $500. In most cases with such a low monetary value it would be unlikely that the claims would be brought individually. Thus, the class action "device has been especially popular in ... cases [ ] where individual persons allegedly injured are in a poor position to seek redress, either because they do not know enough or because the cost of suit is disproportionate to each individual claim." C. Wright The Law of Federal Courts § 72 at 480 & n. 56 (1983 ed.). In the instant case, however, RICO provides for the shifting of attorney's fees. 18 U.S.C. § 1964(c). Should plaintiffs prevail on the merits, it is more likely that defendants would seek to establish some efficient method for the payment of claims, as they will otherwise be forced to bear the costs of each individual plain-

tiff's attorney's fees. *See Northeast Women's Medical Center v. McMonagle*, 868 F.2d 1342 (3d Cir.1989) (uphold attorney's fees award of $64,946.11 where damages were only $887). Moreover, the court will be free to certify a class at that time. *See* Comment, *Reopening the Debate: Postjudgment Certification in Rule 23(b)(3) Class Actions*, 66 Cornell L.Rev. 1218 (1981).

The Second Amended Complaint alleges that litigating these claims separately has the risk of submitting defendants to varying and inconsistent adjudications:

> Proceeding as a class action would eliminate the risk of inconsistent verdicts, and would assure that the terms of any equitable relief awarded to one or more plaintiff would not be in conflict with the terms of equitable relief which might be obtained in a separate proceeding brought by another member of the plaintiff class.

Second Amended Complaint ¶ 60. This argument is directed to the claims for injunctive relief. Having found that injunctive relief in unavailable under RICO, *see infra*, the court need not address the possibility of inconsistent obligations.

### B. Plaintiffs' Motion to Reinstate

Plaintiffs move, essentially, for the court to reconsider its earlier dismissal of plaintiffs' conspiracy claims against Cumberland Farms and its dismissal of certain plaintiffs' claims as barred by the statute of limitations. Plaintiffs rely on decisions announced after this court's November 17, 1987, opinion.

#### 1. Conspiracy Claim

With respect to the dismissal of conspiracy claims against Cumberland Farms, plaintiffs rely on *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir.1989) and *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir.1989).

*Ashland Oil* held that a corporation could be a defendant "person" within the meaning of § 1962(c) as well as the "enterprise" within the meaning of that section, so long as the corporation's role in the pattern of racketeering activity justified holding the corporation accountable. 875 F.2d at 1281 (citing *Haroco, Inc. v. American Nat. B & T. Co. of Chicago*, 747 F.2d 384, 401 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)).

In *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349 (3d Cir. 1987), the Third Circuit held that a corporate employer could not be liable under § 1962(c) for the predicate acts committed by its employees. *Id.* at 1359 (citing *Hirsch v. Enright Refining Co.*, 751 F.2d 628 (3d Cir.1984). *Petro–Tech* continues to be the law of the Third Circuit, *see Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir.1989) (citing *Petro–Tech* with approval as to § 1962(a) claims), and most circuits that have addressed this issue have agreed with the Third Circuit. *E.g., Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985) (plain language of § 1962(c) requires person distinct from enterprise), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984) (bank may not be both enterprise and defendant under § 1962(c)); *United States v. Computer Sciences Corp.*, 689 F.2d 1181, 1190 (4th Cir.1982) (Congress could not have intended that corporation be both "person" and "enterprise" under § 1962(c)), *cert. denied*, 459 S.Ct. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). Even in the Seventh Circuit, not every case allows the corporation to be both a person and the enterprise. *E.g., D & S Auto Part Inc. v. Schwartz*, 838 F.2d 964, 967 (7th Cir.) (corporation may not be vicariously liable for illegal acts of employees; liability only if corporation is "person" perpetrating illegal activity), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); *Liquid Air v. Rogers*, 834 F.2d 1297, 1306–07 (7th Cir.1987) (express language and congressional intent bar liability of corporation as both person and enterprise under § 1962(c)), *cert. denied*, —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *United States v. DiCaro*, 772 F.2d 1314, 1319–20 (7th Cir.1985) (reversing conviction where indictment charged defendant under

§ 1962(c) as both person and enterprise), *cert. denied,* 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986); *Haroco Inc. v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 400 (7th Cir.1984) (language and policies of statute do not allow corporation to be both person and enterprise under § 1962(c)), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). This court, of course, is obligated to follow *Petro–Tech.* Thus, Cumberland may not be a defendant under § 1962(c) for conspiring with its employees to operate itself through a pattern of racketeering acts.

■ This does not entirely dispose of the claims against Cumberland. In *Shearin,* 885 F.2d 1162, the Third Circuit addressed the issues of intra-corporate conspiracies under RICO. In *Shearin,* the complaint alleged that the defendants, a corporation and two of its wholly-owned subsidiaries, *id,* at 1164, had formed a tripartite enterprise within the meaning of § 1962(c). *Id.* at 1165–66. The Third Circuit went on to hold that the allegations that the three corporations that had participated in the affairs of the tripartite enterprise, which was alleged to be defrauding customers, stated a claim under § 1962(c). *Id.* at 1166. The Third Circuit further held that the plaintiff lacked standing under § 1964 to bring suit for the alleged violation of § 1962(c). *Id.* at 1167–68.

The Third Circuit concluded that a corporation could conspire with its wholly owned subsidiaries under § 1962(d), *id.* at 1164, 1166–67, to violate § 1962(c). *Shearin* went on to hold that an injury from an act in furtherance of the conspiracy alleged under § 1962(d) was sufficient to confer standing under § 1964, and that the plaintiff need not show injury from the racketeering acts that are the bases of the underlying violations of §§ 1962(a), (b), or (c). *Id.* at 1168–70.

*Shearin* and *Petro–Tech* present obvious conceptual difficulties. *Petro–Tech* held that the corporation which is the "enterprise" may not be liable as a "person"

under § 1962(c); *Shearin* allowed a suit against a corporation and its wholly-owned[6] subsidiaries for conspiracy. The Third Circuit, however, gave little guidance as to the significance of the distinction between a corporation acting through its employees and a corporation acting through its wholly-owned subsidiaries.

In many ways, the *Shearin* reading of intra-corporate conspiracies is more faithful to the broad remedial purpose of RICO than a narrow reading which is modelled on antitrust law. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). While antitrust law seeks to encourage inter-corporate competition even at a cost to intra-corporate competition, *see Continental T.V. Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), RICO seeks to eliminate all racketeering activity, both inter-corporate and intra-corporate.

This court is bound by the Third Circuit decision in *Shearin,* and this case is indistinguishable. The complaint can fairly be read to allege that the parent company has conspired with its subsidiaries to commit a pattern of racketeering activities in the form of extorting confessions and payments from low-level employees, and then investing the proceeds of those confessions into the enterprise. Second Amended Complaint ¶¶ 10, 12, 13, 186. Although the court has found that the employees do not have standing under § 1962(a), the employees clearly have standing have standing to bring suit under § 1962(d) for violations of § 1962(a) and § 1962(c) under the *Shearin* analysis of § 1962(d).

## 2. Statute of Limitations

■ With respect to the statute of limitations dismissal, plaintiffs cite the rule announced in the Third Circuit decision in *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125 (3d Cir.1988):

The rule which we announce provides that the limitations period for a civil

---

**6.** There might have been some basis for a distinction if *Shearin* had involved subsidiaries that were only partially owned by the parent, and thus not completely under its control.

RICO claim runs from the date the plaintiff knew or should have known that the elements of the civil RICO cause of action existed unless, as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, in which case the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity.

*Id.* at 1130.

In its November 17, 1987 opinion, the court summarized then-existing case law as follows: "[t]hus, the rule that can be gleaned from these decisions is that, absent fraudulent concealment, a RICO claim accrues when the plaintiff knows or should know of the injury which forms the basis of his action." *Curley v. Cumberland Farms,* No. 86–5057(SSB) slip op. at 14. The court specifically rejected plaintiffs' argument that "the nature of a RICO offense, requiring as it does a pattern of racketeering activity, makes it necessary to view RICO claims as accruing only when a plaintiff knows or should know of the pattern of activity, and not when a particular predicate offense has been committed against a particular plaintiff." *Id.*

Although this court's holding in the November 17, 1987 opinion was supported by the case law as it was at the time of that decision, the reasoning of the earlier opinion has been displaced by the Third Circuit decision in *Keystone.* Defendants candidly concede that plaintiffs should be permitted to reinstate these claims, and the court will so order.

### C. Defendants' Motion to Dismiss

Defendants have moved to dismiss the Second Amended Complaint on the following grounds: plaintiffs lack standing to seek injunctive relief; injunctive relief is unavailable under the federal and state racketeering laws; plaintiffs lack standing to pursue claims under § 1962(a) and N.J. Stat.Ann. 2C:41–4(a); the court may not exercise pendent-party jurisdiction over Cumberland. Defendants also move to dismiss other claims, but they are not as closely related to the other issues and will be discussed separately. Plaintiffs initially filed no brief that responded to the merits of the issues raised by defendants, and chose instead to file a cross-motion seeking to strike the motion to dismiss. Plaintiffs claimed it was untimely under Fed.R.Civ.P. 12(g) and that defendants filed it solely to harass plaintiffs' counsel.[7] At oral argument, however, plaintiffs had second thoughts about their failure to address the issues, and requested permission from the court to file another brief. On November 8, 1989, the court granted that request. The court now turns to the sufficiency of the second amended complaint.

### 1. Claims for Injunctive Relief

■ Defendants claim that plaintiffs lack standing to seek injunctive relief because "[n]one of the plaintiffs are employees of Cumberland." Defendants' Brief In Support of Motion To Dismiss at 15 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Federal Kemper Insurance Co. v. Rauscher,* 807 F.2d 345, 350 (3d Cir.1986)). The court notes that the proposed class definition specifically includes present employees of Cumberland; this would appear to dispose of the obstacle presented by the standing doctrine. The complaint further includes present and future employees for purposes of class-wide

---

**7.** The court denies plaintiffs' motion to strike. It is appropriate to review the sufficiency of the complaint in determining whether to certify a class. *In re Orfa,* 654 F.Supp. at 1459. Although the court entertains doubts as to the motives for defendants' filing the motion twenty months after the filing of the second complaint, at approximately the same time as the deadline for plaintiffs to move for class certification, a motion to dismiss may be filed in a motion under Rule 12(c) for judgment on the pleadings, in a responsive pleading, and at trial. Fed.R. Civ.P. 12(g); Fed.R.Civ.P. 12(h)(2). *Accord* 5 C. Wright & A. Miller Federal Practice and Procedure § 1385 at 839 (1960). Moreover, defendants could raise substantially the same claims in a motion for summary judgment. In light of the fact that plaintiffs will be permitted to proceed to discovery in any event, the court sees no reason not to address the motion to dismiss.

injunctive remedies. Second Amended Complaint ¶ 51. It is unnecessary for the court to resolve either the standing issue or the concomitant adequacy of representation issue,[8] however, in light of the court's determination that RICO does not provide for injunctive relief.[9]

The availability of injunctive relief under RICO is an open question in the Third Circuit. *Northeast Women's Medical Center v. McMonagle,* 868 F.2d 1342, 1355 (3d Cir.) (noting that courts are divided on this issue but refusing to decide it), *cert. denied,* —— U.S. ——, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989). The statute on its face makes no provision for injunctive relief.[10] Although § 1964(c) does not expressly limit the plaintiff's remedies, that Congress made an express provision for an equitable remedy in suits brought by the government[11] and simultaneously declined to make a similar provision for private actions carries with it the strong suggestion that no private equitable remedy was intended. *Religious Technology Center v. Wollersheim,* 796 F.2d 1076, 1082–83 (9th Cir. 1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). *See Kaushal v. State Bank of India,* 556 F.Supp. 576, 581–83 & n. 20 (N.D.Ill.1983).

The legislative history further supports the conclusion that Congress did not intend to create a private right of action for injunctive relief. The private remedy in RICO was modelled on the Clayton Act. *McCarter v. Mitcham, Butcher & Singer,* 883 F.2d 196, 206 (3d Cir.1989) (Sloviter, J., concurring and dissenting); *Religious Technology Center,* 796 F.2d at 1084 (cit-

ing S. 1623 §§ 3(c), 4(a); S. 2048, S. 2049, 90th Cong. 1st Sess. (1967), and Belgard, 2 RICO Law Rep. at 539), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). The early versions of RICO, both in the House and in the Senate, explicitly provided for a private injunctive remedy like that provided by the Clayton Act. *Religious Technology,* 796 F.2d at 1084 (citations omitted). Those provisions were not adopted in the final version that was approved by the House and the Senate, and thus Congress "apparently explicitly rejected a private injunctive relief provision." *Id.* at 1085.

Courts that have addressed the availability of injunctive relief under RICO have almost uniformly concluded that RICO does not afford a private injunctive remedy. *See e.g., In re Fredeman Litigation,* 843 F.2d 821, 828–30 (5th Cir.1988); *Religious Technology Center,* 796 F.2d at 1077, *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987); *Trane Co. v. O'Connor Sec.,* 718 F.2d 26, 28 (2d Cir.1983); *Dan River Inc. v. Icahn,* 701 F.2d 278, 290 (4th Cir.1983); *Vietnam Veterans of America, Inc. v. Guerdon Indus.,* 644 F.Supp. 951, 960 (D.Del.1986); *DeMent v. Abbott Capital Corp.,* 589 F.Supp. 1378 (D.Ill.1984). *But cf. Bennett v. Berg,* 685 F.2d 1053, 1064 (8th Cir.1982) (explicitly refusing to decide whether equitable relief was available, but citing, without endorsing or rejecting, scholarship indicating the availability of such relief), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710

---

**8.** None of the named class representatives is presently employed by Cumberland.

**9.** Plaintiffs raised for the first time at oral argument the All Writs Act, 28 U.S.C. § 1651, as a possible basis for the demand for injunctive relief. It would require a strained reading of congressional intent to interpret the provision of the All Writs Act which permits a court to enter an order necessary in aid of its jurisdiction as allowing this court to enter an injunction when congressional intent in enacting RICO was to limit recoveries to money damages.

**10.** 18 U.S.C. § 1964(c) provides the private right of action:

Any person injured in his businesses or property by reason of a violation of section 1962

of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

**11.** 18 U.S.C. § 1964(b) provides:

The Attorney General may institute proceedings under this section. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

(1983).[12]

The court sees no reason, and plaintiffs have offered none, to set out on an uncharted path. Thus, the claims for injunctive relief under RICO will be dismissed.

■■■ The court likewise finds that the New Jersey RICO statute does not provide for injunctive relief in private suits. The New Jersey RICO provisions parrot those of the federal statute. N.J.Stat.Ann. § 2C:41–4(a), like its federal law counterpart, 18 U.S.C. § 1964(a), contains the affirmative grant of jurisdiction to the Superior Court. That section specifically provides the Superior Court with the power to enter orders providing equitable relief. N.J.Stat.Ann. § 2C:41–4(a)(1), (2), (3), (6), (7), (9). Although the statute provides for equitable remedies in cases brought by the Attorney General,[13] it does not speak to the availability of injunctive relief in private actions.[14] This suggests that the New Jersey General Assembly, like Congress with respect to 18 U.S.C. § 1964(c), did not intend to provide for private injunctive relief.

The legislative history supports this conclusion. The New Jersey statute was consciously modelled on the federal statute. *See* Assembly No. 1079 (Comm. for Judiciary, Law, Public Safety and Defense) (Feb. 11, 1980) at 18 (Statement) ("This bill ... follows the model of the Federal law"); Assembly No. 1079 (Comm. for Judiciary, Law, Public Safety and Defense) (Nov. 24, 1980) (Substitute Statement) at 1 ("This bill, which also follows the model of the Federal law"); *id.* at 2 ("this bill draws from the model of the Federal R.I.C.O. statute"). To the extent that the federal statute does not provide for a private equitable remedy, the New Jersey statute similarly omits such a cause of action.

In its amended statement of November 24, 1980, the Committee that introduced the bill as much as said there was no private injunctive remedy: "[t]he original bill provides for injunctive relief *by the State* in connection with a theft and fencing offense and it is the intent of this section to allow for freezing of contested assets at the time of filing of the complaint so that such assets will be intact at the time of judgment." *Id.* at 5 (emphasis added).

The only basis in the legislative history for finding a private injunctive remedy is the statement in Report of the Organized Crime Task Force (County Prosecutors Assoc. and Division of Criminal Justice 1978) (the "Report") which, in discussing the advantages to adding civil remedies to then-existing criminal penalties that were not containing organized crime, stated that "the complainant in a civil suit, whether it be the State or a private person, may ask for emergency injunctive relief pending the final outcome of the action." Report at 7. This statement must be read in the context of a broader discussion of the need for additional remedies for the plague of organized crime, not as the kernel for the injunctive relief remedy that eventually found its way into the New Jersey statute.

Plaintiffs argue that the New Jersey RICO statute is different from the federal statute because N.J.Stat.Ann. § 2C:41–6.1 states that the "remedies provided in this act shall be cumulative with each other and other remedies at law." This provision means only that the government is free to

---

**12.** The only cases in which injunctive relief has been allowed have been suits brought by the government under § 1964(b).

**13.** N.J.Stat.Ann. § 2C:41–4(b) provides:
The Attorney General may institute proceedings in Superior Court for violations of N.J.S. 2C:41–2. In any action brought under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter restraining orders or prohibitions, or take other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

This language is virtually identical to that in 18 U.S.C. § 1964(b).

**14.** N.J.Stat.Ann. § 2C:41–4(c) provides:
Any person damaged in his business or property by reason of a violation of N.J.S. 2C:41–2 mat sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation.
This section, with minor differences, mirrors that of 18 U.S.C. § 1964(c).

seek both injunctive and monetary relief under this act, and that a private plaintiff may seek the monetary relief allowed under this act as well as any other relief to which the plaintiff may be entitled under other statutes. That the New Jersey Anti–Racketeering Act does not require a party seeking relief under its provisions to waive claims under other statutes does not create an independent right to relief. Although the remedies under the New Jersey act are "cumulative," plaintiff must still show the original grant of authority for the relief sought. In the instant case, plaintiff has not shown an independent right to injunctive relief. Thus, the court will dismiss the claims for injunctive relief under the New Jersey statute.

### 2. Standing under RICO Statutes

■ Defendants claim that plaintiffs lack standing to assert claims under 18 U.S.C. § 1962(a) because no single plaintiff has suffered any injury as a result of the use or investment of the proceeds of the alleged racketeering activity. Plaintiffs counter that individual plaintiffs have suffered in that Cumberland used the proceeds from the alleged extortion of past employees in part to fund the salaries of loss prevention specialists who then allegedly extorted money from other employees.

In *Sedima v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court elaborated on the standing requirement under RICO: "the plaintiff has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Id.* at 496, 105 S.Ct. at 3285. The Supreme Court went on to hold, in the context of a claim brought under § 1962(c), that "[w]here the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the harm caused by the predicate acts." *Id.* at 497, 105 S.Ct. at 3285.

The essence of a § 1962(a) claim is very different from a § 1962(c) claim. Under § 1962(c), it is illegal to engage in racketeering activity; by contrast, under § 1962(a), it is illegal to invest the income of racketeering activity. Therefore it is not sufficient for the plaintiff merely to show that the alleged injury was caused by the alleged pattern of racketeering activities. *Leonard v. Shearson Lehman/American Express, Inc.*, 687 F.Supp. 177, 181 (E.D.Pa.1988). "[A] plaintiff seeking civil damages for a violation of section 1962(a) must plead facts tending to show that he was injured by the use or investment of racketeering income." *Grider v. Texas Oil & Gas Corp.*, 868 F.2d 1147, 1149 (10th Cir.1989). In *Rose v. Bartle*, 871 F.2d 331, 357–58 (3d Cir.1989), the Third Circuit adopted this approach, albeit without extensive explanation.

In the instant case, plaintiffs have not shown an injury sufficient to confer standing under § 1962(a). Plaintiffs' argument that they have suffered as a result of the proceeds of one incident of alleged extortion being used to pay the loss prevention specialist who commits the next alleged act of extortion falls short of the required injury. If plaintiffs' view of standing were correct, RICO plaintiffs would be required to plead no more than that the proceeds from one predicate act enabled the enterprise to continue to commit other predicate acts. This view effectively eliminates the standing requirement under § 1962(a), and the court rejects it.

■ Plaintiffs do have standing under § 1964 to bring suit for the alleged violations of § 1962(d). Under *Shearin*, plaintiffs need show only that they were injured by acts in furtherance of the conspiracy. 885 F.2d at 1168–70. In the instant case, the crux of plaintiffs' claim is that they were fired as part of the conspiracy. This is sufficient to confer standing under § 1962(d).

### 3. Pendent Party Jurisdiction

Defendant's Motion to dismiss Cumberland because it is an improper pendent party over whom no independent basis of jurisdiction exists, *see Finley v. United States*, —— U.S. ——, 109 S.Ct. 2003, 104 L.Ed.2d

593 (1989), is moot because the Second Amended Complaint properly pleads an independent basis of federal jurisdiction, namely 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962(d). It is therefore unnecessary to evaluate whether RICO authorizes the exercise of pendent party jurisdiction.

### 4. Other Grounds For Dismissal

■ Defendants seek to dismiss various other claims asserted in the complaint. Defendants argue that the claims of plaintiff McCabe must be dismissed because the "plaintiff cannot recover for personal injury under RICO." Defendants' Brief in Support of Their Motion to Dismiss at 29 (citing *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir.1986)). Plaintiff McCabe does not bring suit merely for personal injury, but also for "lost time and loss of the costs of travel." Second Amended Complaint ¶ 265. McCabe allegedly quit, and then was asked to come back to the store for an interview in which he was asked to confess to theft. He refused, and seeks recovery for the costs of his travelling from his home to the store, and for his time. If McCabe were a large corporation such as Cumberland, these expenses would be deductible as business expenses. Likewise, plaintiff McCabe may seek recovery for such losses as they may constitute injury to his business or property within the meaning of 18 U.S.C. § 1964(c) and N.J.Stat.Ann. 2C:41–4(c). Justice, and the broad remedial purpose of RICO, requires that an individual's expenses which are related to his or her employment are within the reach of the RICO standing requirement.

■ Defendants move for dismissal of plaintiff's pendent claims predicated on Restatement (Second) of Torts § 870. Defendant claims the court should abstain from deciding an unsettled issue of state law. The federal abstention doctrines are animated, in part, by a desire to avoid unnecessary decisions of federal constitutional law, *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), not out of concern for the vagaries of state law. Diversity jurisdiction, albeit less popular today than in the past, has not been abolished and federal courts routinely decide state law questions of first impression. None of the other abstention doctrines apply. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Burford v. Sun Oil*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Therefore, this court will decline to abstain.

Defendants finally move to dismiss the "reservation of rights" for failure to state a claim. Plaintiffs included this in the complaint, one must assume, for purposes of preclusion. *Cf. England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964) (reservation of federal claims to avoid preclusion by subsequent state litigation of issues from which federal court abstains). Such a reservation of rights, however, fails to state a claim, and will be dismissed.

### D. Plaintiffs' Appeal of the Protective Order

Plaintiffs appeal the protective order entered by Judge Simandle on March 29, 1989, pursuant to Fed.R.Civ.P. 26(c). Modelled in part on the protective order approved in *Cipollone v. Liggett Group, Inc.*, 822 F.2d 335, 343 (3d Cir.), *cert. denied*, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987), the order entered by Judge Simandle established a procedure by which defendants may designate information as confidential. If plaintiffs disagree with the designation, and the parties are unable to resolve their disagreement, plaintiffs are entitled to present the dispute to the court. At that time, defendants have the burden of establishing that the designated information is entitled to confidential status. Protective Order at ¶ 2(b).

Plaintiffs challenge the order on three grounds: (1) Judge Simandle exceeded his authority under Fed.R.Civ.P. 26(c) because the order exceeds pending discovery; (2) the order is unconstitutional because it delegates judicial authority; and (3) defendants waived their entitlement to a protec-

tive order because they delayed seeking such an order until eight months after discovery was due to be produced and four months after plaintiffs had moved for an order to compel discovery.

A successful appeal of a magistrate's non-dispositive order must show the order to be "clearly erroneous or contrary to law." 28 U.S.C. 636(b)(1)(A); Fed.R.Civ.P. 72(a); Local Rule 40(D)(4).

■ Plaintiff is unable to show that Judge Simandle exceeded his authority under Fed.R.Civ.P. 26(c). The Rule allows a court to deny discovery altogether. In the instant case, the order does not go so far, for it allows plaintiffs to obtain information. The order does not purport to apply to materials obtained from sources outside discovery. The order further refuses explicitly to govern the use of such information at trial. Protective Order at ¶ 13(a) at 7. In fact, the order does no more than set forth a procedure by which the parties may present a dispute concerning the confidentiality of information; the order itself neither adjudicates the merits of any particular claim of confidentiality nor allows the parties unilaterally to decide such disputes. *See Cipollone,* 822 F.2d at 343 (citing *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1122 (3d Cir.1986)), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). Plainly the order does not exceed the court's authority under Rule 26(a).

■ Plaintiffs' second challenge to the protective order similarly fails. The order does not in any way delegate judicial authority. The final decision on the confidentiality of information sought in discovery rests at all times with the court. The order alters the manner of discovery that would proceed in the absence of the order in only one way: rather than requiring defendants to withhold information to preserve any claim of confidentiality, the order allows defendants to disclose the information subject to a subsequent determination. Thus, the order facilitates disclosure while preserving the court's ultimate authority to decide issues of confidentiality. Therefore, the plaintiffs' second challenge must be rejected.

■ The court must likewise reject plaintiffs' third basis for vacating the protective order. Defendants have stalled this litigation repeatedly. Although the court cannot condone such dilatory tactics, the court is nonetheless reluctant, at this time, to find that defendants are precluded from raising any claim of confidentiality.

## III. CONCLUSION

For the foregoing reasons, the court declines to certify a class action. The RICO claims under § 1962(a) and its state counterpart against the corporate defendants, as well as the claims for injunctive relief, will be dismissed. The § 1962(d) claims against the corporate and individual defendants remain, as do the claims against the individual defendants under § 1962(c), and the analogous state law provisions.

An appropriate order will be entered.

### ORDER

This matter having come before the court on (1) plaintiffs' motion for class certification, (2) plaintiffs' motion to reinstate various claims, (3) defendants' motion to dismiss various claims, and (4) plaintiffs' appeal of the protective order; and

The court having reviewed the submissions of the parties and considered the arguments of counsel; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 29th day of December, 1989 hereby ORDERED that:

(1) Plaintiffs' motion for class certification is DENIED.

(2) Plaintiff's motion to reinstate is GRANTED IN PART and DENIED IN PART, in that the claims dismissed in November, 1987 under the statute of limitations are REINSTATED, and the conspiracy claims against Cumberland Farms, Inc., under 18 U.S.C. § 1962(d) and N.J. Stat.Ann. § 2C:41–2(d) are REINSTATED, while the claims against Cumberland FARMS, Inc. under 18 U.S.C. § 1962(c) and N.J.Stat.Ann. § 2C:41–2(c) are NOT REINSTATED.

(3) Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART in that plaintiffs' claims under 18 U.S.C. § 1962(a) and N.J.Stat.Ann. § 2C:41–2(a) are DISMISSED, plaintiffs' claims for injunctive relief. are DISMISSED, and plaintiffs' RESERVATION OF RIGHTS is DISMISSED, and all other claims ARE NOT DISMISSED.

(4) Plaintiffs' appeal of the protective order is DENIED.

No costs.